Judgment rendered January 12, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,013-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

GROVER D. CANNON                Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 334,303

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT      Counsel for Appellant
By:  Douglas L. Harville

JAMES E. STEWART, SR.           Counsel for Appellee
District Attorney

TOMMY J. JOHNSON
EDWIN L. BLEWER, III
WILLIAM J. EDWARDS
RON C. STAMPS
Assistant District Attorneys

* * * * *

Before PITMAN, STEPHENS, and HUNTER, JJ.

**HUNTER, J**.

The Caddo Parish grand jury returned a bill of indictment charging the defendant, Grover D. Cannon, with the first degree murder of a police officer, a violation of La. R.S. 14:30. The State filed a notice of intent to seek the death penalty. The defendant was found guilty as charged by a unanimous jury. The jury was unable to reach a unanimous decision regarding the death penalty, and the trial court sentenced the defendant to serve life in prison without the benefit of parole, probation, or suspension of sentence. For the following reasons, we affirm.

## FACTS

On August 5, 2015, the defendant, Grover D. Cannon, went to the home of his sister to eat, "wash up," and wash his clothes. The defendant's sister, Latauria Cannon, lived at 3527 Del Rio Street in Shreveport, Louisiana, with her companion, Edward Flakes, and their minor son. The defendant's mother, Ramona Cannon, and another sister, LaTonyia Cannon, were also present at the house. An argument began when Latauria informed the defendant he could not stay at her house because he "was wanted."[1] The defendant, whom Latauria described as being "in a messed up frame of mind," became angry and refused to leave the residence.

The argument escalated when the defendant accused his mother of "standing over his food," and the defendant began to direct verbal threats toward members of his family. When his mother threatened to call the police, the defendant replied, "If you call the police, I'm killing him and

_____

[1] At that time, a warrant had been issued for the defendant's arrest for the attempted murder of Darren Williams. On July 15, 2015, Williams had been shot multiple times, and he and another witness had identified the defendant as the shooter.

everybody in the house." Concerned about the threats, Latauria sent her son across the street to the home of Nichelle George to ask Nichelle to come to her (Latauria's) house.[2] Nichelle came over, and Ramona and LaTonyia left the residence. Soon thereafter, Latauria and Nichelle went to Nichelle's house, leaving the defendant and Edward Flakes as the sole occupants of Latauria's house.

At approximately 9:00 p.m., Nichelle called 911, reported "a disturbance" at her neighbor's house, and provided the dispatcher with Latauria's address. Latauria then contacted Flakes via text message and told him to leave the house because "police were coming." The 911 dispatcher sent out a call, alerting police officers of a "suspicious person with a weapon threatening neighbors."

Shreveport Police Department ("SPD") police officer Thomas LaValley was patrolling nearby and responded to the call. Upon arriving at the residence, Officer LaValley walked toward the front door as Flakes exited the house. The officer, unaware of the identity of the "suspicious person," approached Flakes with his weapon drawn, ordering him to "show me your hands." Nichelle and Latauria immediately intervened and informed the officer Flakes was not the person about whom the call had been made; the officer returned his weapon to the holster. Flakes apprised Officer LaValley the defendant had threatened to kill his family, and he was "in the kitchen, and he has a gun." Latauria warned Officer LaValley he should not enter the house "without backup" because the defendant was armed and had

---

[2] During her testimony at trial, Latauria denied hearing the defendant make threats, and she denied sending her son to the neighbor's house. She testified she was unable to recall many of the events of that night due to having suffered "an aneurysm of the brain."

threatened to kill them. Armed with the information from Flakes and Latauria, Officer LaValley drew his weapon, turned on the flashlight attached to the gun, knocked on the door, and entered the residence.

Officer LaValley was wearing a digital audio recorder, which was connected to the mobile video system ("MVS") in his police vehicle. The MVS captured audio of the shooting and the events leading up to it, and the recording was played for the jury and entered into evidence at the defendant's trial. Officer LaValley could be heard knocking on the door of the house and walking inside. He was dressed in full uniform; however, the recording did not capture him identifying himself as a police officer. Approximately 8-10 seconds after entering the residence, Officer LaValley was heard ordering the occupant of the house to "show your hands." Shortly thereafter, a barrage of gunshots rang out. Officer LaValley radioed dispatch, requesting a medic. Three more gunshots could be heard as Officer LaValley called for assistance. The recording was then silent.

Officer Amber Futch arrived on the scene and found Officer LaValley inside the house suffering from multiple gunshot wounds. Officer Futch observed Officer LaValley's .40 caliber Glock semi-automatic service weapon was missing from his holster.[3] Other members of the SPD, medics, and the Shreveport Fire Department arrived on the scene. Officer LaValley was transported to LSU/University Health Medical Center where he was

---

[3] Officer LaValley's service weapon, described as a black handgun with a flashlight attached, was never recovered.

pronounced dead. It was later discovered Officer LaValley had been shot

with two different guns, a 9mm and a .40-caliber weapon.[4]

Latauria, Flakes, and Nichelle ran across the street to Nichelle's house

when they heard the gunshots. Nichelle's husband, Dennis Sinville, called

911 to report hearing gunfire and to alert the authorities a police officer had

entered the residence but had not exited. Sinville also reported seeing a

person "with a muscular build" exit the house and run down the side of the

house. He further stated he had seen the same man in the front yard of the

residence earlier that day.[5]

Witnesses on the scene informed the law enforcement officers Grover

Cannon was inside the house when the shooting occurred. Police officers

began canvassing the area, actively searching for the defendant. The officers

learned the defendant's father, Grover Owens, lived nearby, and they went

to Owens' residence to question him with regard to the defendant's

whereabouts. According to the police reports, Owens informed the officers

the defendant had been to his house, not wearing a shirt, and when he

arrived, he was "perspiring and asking for water." Owens also stated the

---

[4] During the defendant's trial, the medical examiner, Dr. James Traylor, testified with regard to the results of Officer LaValley's autopsy. Dr. Traylor stated Officer LaValley sustained six gunshot wounds, which consisted of three penetrating wounds and three perforating wounds. The two gunshot wounds to the officer's head were from different caliber bullets.

[5] Sinville later identified the defendant in a photographic lineup as the man he saw exiting the house. Latauria also identified the defendant in a photographic lineup. In her statement to police officers after the shooting, Latauria described the defendant's history of violence and threats against members of his family. She stated family members "did not mess with" the defendant because of his violent nature. She also told police officers the defendant had once attacked their sister, LaTonyia, who has an intellectual disability, and "knocked out her teeth." The defendant had also attacked his mother and "strangled her."

4

defendant told him he had shot a police officer, and he was in possession of two guns, one of which was a "black handgun" with a flashlight attached.[6]

Meanwhile, local law enforcement officers processed the crime scene and recovered 14 .40 caliber shell casings and one 9mm shell casing. Projectiles were also retrieved from the scene and from Officer LaValley's body. The 9mm shell casing recovered from the scene on Del Rio Drive was compared to those found at the scene of the shooting of Darren Williams and was believed to have been fired from the same weapon.

Based on the statements of witnesses, law enforcement officials obtained a first degree murder warrant for the defendant's arrest. "Wanted" flyers were created and issued to area law enforcement officers.

On August 6, 2015, SPD Officer Jerry Alan Alkire was working with the FBI Northwest Louisiana Violent Crime Task Force. At that time, area law enforcement officers were actively searching for the defendant. Officer Alkire received information the defendant was located in the 3800 block of Jackson Street in Shreveport. Law enforcement officers went to 3818 Jackson Street and located the defendant in a storage shed behind the house. The defendant was apprehended, and a Jimenez Arms JA 9mm semi-automatic handgun was recovered from the shed. It was later discovered the single 9mm casing recovered from the scene of the Del Rio Drive shooting was consistent with the ammunition from the weapon recovered from the shed following the defendant's arrest. Additionally, according to police

---

[6] Owens did not testify at the defendant's trial; he died before the trial commenced.

5

reports, two .40 caliber bullets, consistent with those carried by Officer LaValley, were recovered from the defendant's person.

The defendant was placed under arrest. The Caddo Parish grand jury returned an indictment charging the defendant with first degree murder, in violation of La. R.S. 14:30. On October 26, 2015, the state filed a notice of intent to seek the death penalty.[7]

At some point during the proceedings, a conflict arose between the defendant and his defense counsel pertaining to the appropriate defense to pursue. The defendant articulated his desire to assert an alibi defense, while his defense team conveyed its intent to pursue a self-defense claim. On August 10, 2018, the state filed a motion requesting the trial court to conduct a colloquy with the defendant with regard to his choice of defenses to ensure compliance with the United States Supreme Court's decision in *McCoy v. Louisiana*, ___ U.S. ___, 138 S. Ct. 1500, 200 L. Ed. 821 (2018). Following a hearing, the trial court signed an "Order Setting Pre-Trial Procedure for Evaluating Issues Related to *McCoy v. Louisiana*" and reappointed mental health experts to reevaluate the defendant's capacity to stand trial. The trial court noted that if it determined the defendant had the capacity to proceed, then it would conduct a colloquy with him.[8]

---

[7] Thereafter, defense counsel filed a motion to determine the defendant's mental capacity to proceed. Following a mental health evaluation and hearing, the trial court determined the defendant was competent to stand trial, and the defendant entered a plea of not guilty. On February 28, 2018, the defendant filed a motion to change his plea from not guilty to not guilty by reason of insanity, and he later filed a motion for a second sanity hearing. The defendant was reevaluated, and the trial court ruled he possessed the mental capacity to proceed and to assist in his defense.

[8] The defendant filed a writ application in this Court. By order dated November 6, 2018, this Court denied the writ application. The Supreme Court also denied the defendant's writ application. *State v. Cannon*, 18-1846 (La. 11/20/18), 257 So. 3d 182.

Subsequently, during a hearing conducted on December 20, 2018, the state expressed its concern with the divergent defenses and again noted the possible implication of the defendant's rights under the Sixth Amendment to the United States Constitution, in light of *McCoy*, *supra*. The state argued as follows:

> [A]n alibi defense is specifically mutually exclusive with a self-defense claim because if you were not present you cannot use force reasonable or otherwise in any type of confrontation that you weren't at.
>
> ***
>
> Mr. Cannon has made perfectly clear that he wishes to pursue a defense of alibi rather than [a] self-defense claim which is clearly warranted as the defense argued. Mr. Cannon's object is crystal clear that I was not there. I did not have any part of the death of Officer Thomas [LaValley]. If we proceed and the Defense Counsel argues that Mr. Cannon was there and shot Officer [LaValley], but that shooting was justified based on some reasonable belief of the use of force that directly subverts the object of Mr. Cannon's defense which I was not there and I had no responsibility for the killing of Thomas [LaValley].
>
> ***

In response, defense counsel stated:

> We plan on going for a not guilty verdict on behalf of Mr. Cannon. The question will be *** how it gets there, are there multiple ways to get there, what is permissible. But we don't think there's a *McCoy* problem.
>
> ***

The trial court took the matter under advisement, but did not issue a ruling.

Another hearing was held on January 3, 2019, during which the defendant stated, in open court, his desire "to remove [defense counsel] Dwight Doskey in violation of *McCoy versus Louisiana* [because] *** he's constantly following up on the same thing, which is a violation of my Sixth Amendment [rights]." The trial court denied the defendant's motion, and on January 14, 2019, this Court denied the defendant's writ application.

Thereafter, Mr. Doskey filed a motion to withdraw as counsel based on the defendant's contention his rights were being violated pursuant to *McCoy*, *supra*. Mr. Doskey argued:

> I've got two arguments *** the first is that the Code of Professional Responsibility says that I've got to afford him his Sixth Amendment rights, and to afford him his Sixth Amendment rights, and while Mr. Cannon and I disagree on exactly what that means under *McCoy*, that Rule 1.16 of the rules says that, if a lawyer is discharged, he must file a motion to withdraw. I'm therefore, filing this one. If the representation will result in violation of the Rules of Professional Conduct or other law, I must also file a motion to withdraw.
>
> We're attempting to ascertain the limits of *McCoy*, as we have discussed in a number of motions through this Court, Your Honor. And because, because, if one interprets *McCoy* in a certain way, I might be violating the Rules of Professional Conduct or of the law, I'm filing that motion to withdraw.
>                                        ***

Defense counsel also filed a motion to continue trial, arguing, *inter alia*, "all parties are still perplexed by the meaning of *McCoy* . . . and certainly, [the defendant] is entitled to have his opinion on *McCoy* heard, too[.]" The trial court denied counsel's motion to withdraw and granted a continuance on other grounds.

On February 8, 2019, the trial court conducted a colloquy with the defendant in the presence of defense counsel, but outside the presence of the state. The colloquy, which the trial court stated it was conducting "out of an abundance of caution," proceeded as follows:

> THE COURT: Mr. Cannon, through written pleadings and reports filed in this case, this Court has been made aware that you have expressed some dissatisfaction with the defense of self-defense and that you have expressed an interest or a preference for an alibi defense. Is that correct?
>
> [THE DEFENDANT]: Sort of, kind of, yeah.

8

THE COURT: Okay. You want to explain your answer to me briefly?

[THE DEFENDANT]: Because, at the time – at the time of that statement, it was, like I expected – I expected someone to come forward who, I guess, decided not to come forward. So the alibi defense kind of is shaky now.

THE COURT: Out of an abundance of caution, I'm going to ask you some questions and explain some things to you. And then I'll give you a chance to speak to your lawyers, and then we will come back on the record later. Okay?

[THE DEFENDANT]: All right.

THE COURT: All right. Mr. Cannon, please allow the Court to explain to you the law concerning the requirements of proof when self-defense is claimed or urged.
*** [The trial court proceeded to read the law pertaining to self-defense.]***

THE COURT: Sir, do you understand that?

[THE DEFENDANT]: Yes, ma'am.

THE COURT: Mr. Cannon, I am not seeking specific information about the content of your discussions between you and your lawyers, but do you understand what I just read is what I propose to instruct the jury as being the law of self-defense, as well as the requirements of raising an alibi defense?

[THE DEFENDANT]: Yes, ma'am.

THE COURT: Mr. Cannon, have you and your attorneys spoken about the advantages and disadvantages of the defense of self-defense?

[THE DEFENDANT]: Yes, ma'am.

THE COURT: All right. Mr. Cannon, you are represented by trained and experienced attorneys, and you should consider that – their advice in making decisions concerning your defense. And the Court believes that it would be a mistake to ignore the advice of your attorneys. Do you understand that, sir?

[THE DEFENDANT]: Yes, ma'am.

THE COURT:  We will now – I'm going to give a 20-minute recess for you and your lawyers to speak in the cleared courtroom.  Additional time will be given if helpful.  I'll give you this opportunity to speak with your lawyers[.]

Following a recess, the colloquy continued as follows:

MR. DOSKEY:  We have had an opportunity to talk, although maybe you should ask Mr. Cannon that afterwards.

THE COURT:  Yes, sir.

MR. DOSKEY:  But I told him – one of the things I told him while you were out of the Court is that I think what's best is if we both make our positions known to the Court because I think it aids you in ruling and certainly it aids if it has to go to the Supreme Court for the Supreme Court in ruling.
    So I wanted to put a couple of things on the record, which I've told Mr. Cannon as closely as I can to the exact words that I'm going to use.  *** [U]nless you order otherwise, I'm going to put on what I want to put on before a jury.  And if you order me to put on alibi, I'll put on alibi.
    But I'm also planning, as I told Mr. Cannon, to raise the issue of self-defense in my questioning of witnesses unless I am ordered specifically not to.  So I wanted him to be aware of my position on that, Your Honor.

THE COURT:  Duly noted.  Mr. Cannon, have you thought about the advice of your attorneys?

[THE DEFENDANT]:  Yes, ma'am, I thought about it, and –

THE COURT:  And what defense do you wish to pursue, a defense of self-defense or alibi?

[THE DEFENDANT]:  Neither.  Neither, really.  Because with the alibi, the alibi defense is kind of – it's kind of rocky because the person who was supposed to come forward don't want to have nothing to do with this situation at all.  And if I was to go off the actual defense, it would – I would lean more to – to conspiracy than anything.  So he asked me to ask you to rule on alibi if he chose to, but I would rather go with conspiracy, if – if you was [sic] to rule on alibi, I would scrap that and ask you to rule on conspiracy.

THE COURT:  Okay.  I'm not ruling on it.  I'm just asking you to state what your preference is so it will be made of record.

10

All right.  So my question, though, is what defense do you wish to pursue, a defense of self-defense or alibi or I'm guessing you're adding now conspiracy?

[THE DEFENDANT]:  Yeah. *** I lean toward conspiracy, not – I don't want alibi or self-defense.

***

After a lengthy jury selection process, opening statements in the defendant's trial commenced on November 14, 2019.  During his opening statement, defense counsel informed the jury all but one of the shots fired inside the Del Rio Drive residence were fired from Officer LaValley's weapon, and the evidence demonstrated the officer began firing in the direction of the kitchen soon after he entered the residence.  Counsel further stated it is unknown who fired the shot which killed Officer LaValley, and "whoever" was in the residence "knew that Officer LaValley was shooting at them and kept pulling that trigger."  Additionally, counsel stated:

> You'll have to take into consideration what, if any, crime was committed by somebody who saw a stranger in the house come in, point a gun, and start shooting.  That's where the idea of self-defense comes from.
>
> The curtains, the inability to know, the failure to announce – all of these things could have been avoided.  *** First and foremost, first and foremost, there should have been an announcement: "This is the police.  You want to come out. You want to surrender."
>
> ***
>
> [The defendant] will tell you that he wasn't even present there. Nobody is actually going to identify [the defendant] as being the black man who ran out of there.
>
> ***

Numerous witnesses were called by the state to testify at the defendant's trial, and an abundance of evidence was presented.[9]  The defendant took the stand to testify in his own defense, and he provided his counsel with a list of questions he (the defendant) had drafted.  The defendant admitted he was at Latauria's residence the day Officer LaValley was killed, but he denied being there at the time of the shooting.  He also admitted he became angry with his mother "because she was standing over my food."  However, the defendant testified he did not threaten his family members.  Furthermore, the defendant testified he was not in agreement with the self-defense claim his defense team was putting forth.  He stated, "I feel, if I didn't do anything, why should I plead self-defense?"

The defendant reiterated he was not present when Officer LaValley was killed; he denied killing the officer; and he denied possessing a firearm on that date.  The defendant testified he remained in his sister's kitchen throughout his visit because he wanted to be able to see out of the windows. He explained he had heard "someone" wanted to kill him, and he was aware there was a warrant for his arrest.  The defendant also stated the state's witnesses were "lying" because they wanted to "cover up something or to make theyself [sic] look good."  Additionally, the defendant testified he did not have any bullets on his person at the time of his arrest, and he denied

---

[9] The following witnesses testified for the state at trial:  Sergeant David Heaser, Edward Flakes, Nichelle George, Officer Yolonda Williams, Officer Marcus Mitchell, Officer Amber Futch, Officer Jamie Bryant, Corporal Chadvist Prim, Fireman Britt Gunn, Fireman Garrett Wilson, Sergeant Matt Sharpley, Corporal Jennifer White, Sergeant Tracy Mendels, Dr. James Traylor, Firefighter/Paramedic Joshua Porter, Ramona Cannon, Latauria Cannon, Dennis Sinville, Corporal Clinton Grisby, Officer Jerry Alan Alkire, Trooper William Hughes, Monnie Michalik (laboratory analyst), Captain Jason Turner, Corporal John Madjerick, Darren Williams, Deputy Garrett Hill, Larry Clarkson, Corporal David Bonillas, Detective Shawn Hinderberger, and Carla White (forensic scientist).

ever being in possession of Officer LaValley's gun.  Further, the defendant

denied placing a gun in the shed where he was found, and he denied

shooting Darren Williams.

Additionally, the defendant expressed his belief he was "framed" by

law enforcement officers, and stated "[I]f [Officer LaValley] was shot with

them 40-caliber bullets, one of his coworkers did that."  The defendant

reiterated he left the house before the shooting occurred, and he stated it was

"impossible" for him to be in possession of two 40-caliber projectiles

because Officer LaValley's ammunition was "accounted for."[10]

During his testimony on cross-examination, the defendant stated his

mother would have called the police if he had threatened his family member

because "that woman calls the police for any little thing."  He also testified

he would have left the residence if anyone had called the police.  According

to the defendant, he left the residence before the police were called, and he

was unaware police officers were on their way.  He stated Latauria was

being truthful when she testified he and Flakes were the only occupants of

the house after Latauria left, but Flakes was lying when he testified he (the

defendant) was sitting in the chair with a cell phone when he (Flakes) left

---

[10] The defendant testified as follows:

> Because the State and [Sergeant] Mendels agreed that the 14 shells on the
> scene – 11 projectiles were recovered, 3 unaccounted for.  The three
> unaccounted – as being accounted for was the one to LaValley's head, the
> one to his arm, and the one caught on the mike box.  That add up to be
> consistent with the 14 shells.  They claimed that I had two 40-caliber
> projectiles – cartridges when they got me from Jackson Street.  If you go
> back to Del Rio Street, two projectiles went out the house – one out the
> back door that wasn't recovered, one out the right side of the window of
> the house that wasn't recovered.  That's 18 altogether.  It's impossible.

According to the record, there is a discrepancy regarding the number of projectiles
recovered by law enforcement officers.  However, the defendant has not raised this issue
in this appeal.  *See*, Rule 1-3, Uniform Rules Courts of Appeal.

the house.  The defendant testified he knew there was a warrant for his arrest for attempted second degree murder, and sitting in the kitchen afforded him "a straight view of anything that come in front of the house *** if a police was to come *** I'm going to see him, so I know to go on and get on."  The defendant also testified he left the house through the front door before the police officers arrived, and he did not have a gun when he went to his father's house.  The defendant expressed his belief that after he left Latauria's house that night, an unidentified person "snuck" inside and committed the murder of Officer LaValley.

During his closing argument, defense counsel re-urged his argument with regard to self-defense.  He stated, in pertinent part:

***

First thing you've got to decide is whether or not the State met its burden of proof in showing that Grover Cannon is the one who shot Officer LaValley, and then and only if you decide that, as I told you all through voir dire and in opening statement, you would have to decide what, if any, crime was committed when he shot Officer LaValley.  Because, as we all recognize, there is justifiable homicide.  There is a shooting in which one can be held not responsible for it.  Self-defense.

***

Self-defense, remember, can arise from the evidence.  Even if Grover Cannon said self-defense wasn't involved that day and wants you to believe that he wasn't there, if you believe that he was there, you've still got a duty to look at the evidence. ***  So let's take it – let's take it to this next level of analysis, where you and I are convinced that maybe it's – as jurors, we're convinced that it's Grover that's in the house and that Grover was the one who ended up shooting Officer LaValley.  Remember what the family said.  They were afraid.

[S]ometimes even innocent circumstances can result in a self-defense claim.  It happens all the time.  Police say all the time, right now, "I was legitimately in fear of my life, and that's why I shot."  And you know what?  It's true.  The judge will tell you it doesn't actually have to be a threat to you for you to act in self-defense.  What matters is whether you perceive a threat and

14

whether a reasonable person in your position would have perceived a threat.

But if you find that Grover's in that house, let's talk about it from Grover's position. The family was afraid. The family didn't want to irritate Grover further. Every single witness [stated] *** "we did not tell him the police had been called." And that is very important once you decide it is Grover in the house.

***

The dispatcher took the call. What have you heard on that call? "Tell the police to come quietly. Don't use lights. Don't use sirens. Don't let Grover know you are police coming. Don't let him know you are police coming."

And you know what? Officer LaValley did *** exactly as that family asked. He went quietly. You saw the MVS. No lights, no sirens. *** So Officer LaValley gets out there, and he's told the relative in the house may be armed. And what's he also told? What did he also hear? Who told him to go in quietly? So maybe he could get Grover unaware. That's how these things happen. ***

Once you believe it's Grover in there, you've got to consider how he was that day. "Grover's jumpy. Please wait for backup." *** [Officer LaValley] pounds on the door, gun drawn, light attached to his gun. Who knows why he beats on the door and yet doesn't announce himself as a policeman? Because you want to make sure that the person inside knows that you're the police coming for them.

***

[S]elf-defense could also result from confusion. *** According to Edward Flakes, Grover's in the back of that house, isn't he? He's back in the kitchen, right? He's back in the kitchen. You know, there's the TV on. There's the air conditioner on. Maybe you hear that pounding, but the one thing you don't hear, because it never happened, is anybody saying that it was the police.

***

Maybe all you see, actually is a white guy coming into your family's house, pointing a gun at you, and telling you that he wants to see your hands.

***

After deliberating, the jury found the defendant guilty as charged of the first degree murder of Officer LaValley. The penalty phase ensued, and

15

the jury was unable to reach a unanimous decision with regard to the death penalty.  The trial court sentenced the defendant to serve life in prison without the benefit of parole, probation, or suspension of sentence.

The defendant now appeals.

## DISCUSSION

The defendant contends his Sixth Amendment rights were violated when the trial court allowed defense counsel to present a self-defense argument over his express objection.  The defendant argues that by allowing counsel to argue self-defense, the trial court permitted the jury to be given the impression defense counsel was rejecting the defendant's contention he was not present and did not kill Officer LaValley.  According to the defendant, defense counsel effectively "confessed his guilt" in the presence of the jury.

The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." *McCoy v. Louisiana*, 138 S. Ct. at 1507; *Faretta v. California*, 422 U.S. 806, 818, 95 S. Ct 2525, 45 L. Ed. 2d 562 (1975).  The right to defend is personal, and a defendant's choice in exercising that right "must be honored out of that respect for the individual which is the lifeblood of the law." *McCoy v. Louisiana*, 138 S. Ct. at 1507, *quoting Faretta v. California*, 422 U.S. at 834.  The choice is not all or nothing:  to gain assistance, a defendant need not surrender control entirely to counsel.  For the Sixth Amendment, "in grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta v. California*, 422 U.S. at 819-20.

16

In *McCoy v. Louisiana*, *supra*, the defendant became aware his retained counsel intended to concede the defendant murdered three members of his estranged wife's family. Two days before the trial was set to commence, the defendant moved to replace counsel; the trial court denied the motion. During his opening statement, defense counsel stated, "I'm telling you Mr. McCoy committed these crimes" while suffering "from serious emotional issues." The defendant was found guilty as charged and was sentenced to death. The Louisiana Supreme Court affirmed the convictions and death sentence. *State v. McCoy*, 14-1449 (La. 10/19/16), 218 So. 3d 535.

The United States Supreme Court granted certiorari, and reversed the defendant's convictions and sentence. *McCoy v. Louisiana*, *supra*. The Court stated, in pertinent part:

> Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. Some decisions, however, are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against him, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may he insist on maintaining his innocence at the guilt phase of a capital trial. These are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are.
>
> * * *
>
> Preserving for the defendant the ability to decide whether to maintain his innocence should not displace counsel's, or the court's, respective trial management roles. Counsel, in any case, must still develop a trial strategy and discuss it with his

17

client, explaining why, in his view, conceding guilt would be the best option. In this case, the court had determined that McCoy was competent to stand trial, *i.e.*, that McCoy had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." If, after consultations with [counsel] concerning the management of the defense, McCoy disagreed with [counsel's] proposal to concede McCoy committed three murders, it was not open to [counsel] to override McCoy's objection. [Counsel] could not interfere with McCoy's telling the jury "I was not the murderer," although counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction.

\*\*\*

138 S. Ct. at 1508-09 (internal citations omitted).

In *State v. Clark*, 12-0508 (La. 6/28/19), 285 So. 3d 414, *reh'g denied*, 12-0508 (La. 9/6/19), 278 So. 3d 364, and *cert. denied*, 141 S. Ct. 272, 208 L. Ed. 2d 37 (2020), the defendant was convicted of the first degree murder of a correctional officer during a failed attempt to escape from Angola, where he was serving a life sentence for committing a prior first degree murder. Prior to the defendant's trial, the trial court conducted a colloquy in chambers to determine whether a conflict existed between the defendant and his counsel over "defense strategy." The defendant expressed a "difference of opinion" with counsel because, according to the defendant, counsel's strategy consisted of "throwing [the defendant] under the bus" by asking the jury to find him guilty of second degree murder to avoid the death penalty. Thereafter, the defendant opted for a "hybrid" representation, whereby he represented himself as lead counsel with the assistance of appointed counsel. During his opening statement, the defendant informed the jury he participated in the attempt to escape, and he was present when the corrections officer was attacked. However, the defendant maintained he

18

did not participate in the murder, and he attempted to intervene on the officer's behalf. The jury found the defendant guilty and sentenced him to death.[11] On remand, the Court reviewed the case in light of *McCoy v. Louisiana*, and found there was no violation of the defendant's Sixth Amendment right to autonomy. The Court stated:

> Counsel did not concede appellant participated in a murder of any degree, and the record does not show that counsel had determined to do so.
>
> &#42;&#42;&#42;
>
> The record shows that appellant and counsel were aligned in their strategy to deny involvement in the murder while admitting participation in the attempt to escape. While the nature of their disagreement is not clear, it is clear that this record does not reflect an intractable disagreement about the fundamental objective of the representation.
>
> &#42;&#42;&#42;

*Id*. at 419-20.

In the instant case, we acknowledge the defendant's constitutional right to "decide that the objective of the defense is to assert innocence." Our review of the record demonstrates the defendant expressed his objective to assert his innocence, and he disagreed with his counsel's strategy to argue self-defense. During his examination and cross-examination of witnesses, and while presenting his opening and closing statements to the jury, trial counsel repeatedly pursued the objective of a "not guilty" verdict. In doing so, counsel asserted the defendant's innocence and expressed "whoever" shot the police officer did so in self-defense because Officer LaValley approached the residence without utilizing police lights and sirens, and he

---

[11] The Louisiana Supreme Court affirmed the defendant's conviction and sentence. The United States Supreme Court granted certiorari and remanded the matter for further consideration in light of *McCoy v. Louisiana*, *supra*.

entered the darkened house after failing to announce his identity as a police officer. Defense counsel proceeded to argue, "if and only if," the jury decided the defendant shot Officer LaValley, then self-defense must be considered.

It is apparent from this record trial counsel did not concede, admit, or suggest the defendant committed any element of the offense of first degree murder. Counsel also clearly expressed the defendant's assertion he did not commit the crime. As stated above, during his opening statement, defense counsel denied the defendant was involved in the murder and pointed out none of the witnesses would be able to testify the defendant was inside the house when the murder was committed. Unlike the record in *McCoy*, *supra*, this record does not establish counsel planned to concede the defendant's guilt over the defendant's objection.

After reviewing this record in light of *McCoy*, *supra*, and its line of jurisprudence, we find none of defense counsel's statements contained a specific admission of the defendant's guilt. Rather, the record reveals the defendant remained adamant in his intent to pursue a "not guilty" verdict, and his defense counsel developed a strategy to collaborate with him in an effort to achieve that goal. The defendant testified he was not present when Officer LaValley was killed, and his counsel advanced his claim before the jury. Defense counsel further pursued an alternative theory of self-defense, by arguing "whoever" was in the house heard a knock on the door, and saw an armed person enter the house without announcing himself as a police officer.

Consequently, we find defense counsel, by skillfully framing the claim of self-defense, avoided admitting the defendant's guilt. Therefore, counsel avoided violating the defendant's Sixth Amendment rights pursuant to *McCoy*, *supra*.

## CONCLUSION

For the reasons set forth herein, the defendant's conviction and sentence are hereby affirmed.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED.**